Filed 8/17/15 (this opn. precedes companion case, S211329, also filed 8/17/15)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, ) S211078
)
    v. )
) Ct.App. 6 H037207
BRUCE LEE BLACKBURN, )
) Santa Clara County
    Defendant and Appellant. ) Super. Ct. No. BB304666
_____ )

    The statutory scheme for extending the involuntary commitment of a mentally disordered offender (hereafter sometimes MDO) beyond termination of parole requires the trial court to "advise the person of his or her right to be represented by an attorney and of the right to a jury trial" and to hold a jury trial "unless waived by both the person and the district attorney." (Pen. Code, § 2972, subd. (a) (hereafter section 2972(a)).) We granted review to decide whether a trial court must advise the defendant personally of his or her right to a jury trial and whether the trial court must obtain a personal waiver of that right from the defendant before holding a bench trial to extend the defendant's commitment as a mentally disordered offender.

    We conclude that the trial court must advise the MDO defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence — that is, evidence sufficient to raise a reasonable doubt — that the

1

defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision.

Here, the trial court did not advise defendant Bruce Lee Blackburn of his right to a jury trial, did not obtain Blackburn's personal waiver of that right, and did not find that there was substantial evidence that Blackburn lacked the capacity to make a knowing and voluntary waiver. Thus, the trial court erred in conducting a bench trial that extended Blackburn's commitment. When a trial court errs in completely denying an MDO defendant his or her statutory right to a jury trial, the error constitutes a miscarriage of justice and automatically requires reversal. In Blackburn's case, however, because the trial court and the parties, in reliance on prior law, likely did not contemplate the need to make a record in conformity with today's holding, we reverse the Court of Appeal's judgment upholding the extension order and remand the case to that court with directions to remand to the trial court for a proper determination of whether Blackburn personally made a knowing and voluntary waiver of his right to a jury trial or whether, at the time of counsel's waiver, there was substantial evidence that Blackburn lacked the capacity to make a knowing and voluntary waiver.

**I.**

In 2004, Blackburn was convicted of first degree burglary and forcible false imprisonment. Blackburn had entered the home of an 85-year-old woman at night, and she awoke to find him naked and lying on top of her. He pinned her down with his legs and restrained her by pulling her hair, but the woman managed to escape. When the police arrived, they found Blackburn sitting naked on the toilet, eating pork chops, and speaking incoherently. In December 2006, he was declared a mentally disordered offender and committed to Atascadero State Hospital as a condition of parole. His commitment was extended in 2009 and again in 2010.

2

In April 2011, the Santa Clara County District Attorney filed a third petition to extend Blackburn's commitment. No record was kept of the relevant pretrial proceedings. However, according to a settled statement requested by the Court of Appeal, defense counsel notified the trial court that Blackburn opposed an extension of his commitment and wanted a trial. Defense counsel requested a bench trial, and the prosecutor agreed.

At trial, Dr. Kevin Perry testified that Blackburn suffered from "schizoaffective disorder, bipolar type" and was not in remission. He noted that Blackburn was paranoid, believed that other patients were stealing from him, believed that he is the Son of God, and suggested that he could communicate over long distances without technology. Blackburn appeared to understand the purpose of the evaluation but jumped from topic to topic without logical connections. Blackburn generally continued to take his medication after a court order compelling him to take it had expired and realized that it was helpful to attend group therapy. When asked about the basis for his conclusion that Blackburn presented a risk to the community, Dr. Perry responded that he showed "active symptoms of the same disorder that was previously adjudicated as a causal or an aggravating factor in a violent crime." Dr. Perry also explained that before Blackburn could be released, he needed to develop a discharge plan to help identify and manage his symptoms, and that Blackburn had not completed a viable plan. Blackburn did not testify and did not attempt to undermine Dr. Perry's testimony. The court sustained the petition and extended Blackburn's commitment.

Blackburn appealed, arguing that the trial court prejudicially erred by failing to advise him of the right to a jury trial and by conducting a bench trial without first obtaining his personal waiver of that right. Although Blackburn's commitment had expired, the Court of Appeal exercised its discretion to address

3

his claims because the issues are recurring and would otherwise evade review. The court held that the language of section 2972(a) "imposes a mandatory duty" on the trial court to advise the defendant and "reflects a legislative intent to judicially ensure that 'the person' knows that he or she has the right to a jury trial." (All subsequent statutory references are to the Penal Code unless otherwise indicated.) The Court of Appeal found that the trial court had not advised Blackburn of his right to a jury trial, but held that the omission was harmless because it was not reasonably probable Blackburn would have obtained a more favorable result had he been advised of his right to a jury trial.

The Court of Appeal further held that section 2972(a) does not require personal waiver of the right to a jury trial. However, the court said, because the purpose of the jury trial advisement is "to inform the MDO of the right to a jury trial so that he or she can decide whether to waive it," section 2972(a)'s waiver requirement cannot reasonably be read to give counsel "exclusive control" over the decision whether to waive a jury trial. Instead, the court explained, counsel may waive a jury trial only "at the MDO's direction or with his or her knowledge and consent," or "over an MDO's objection when the circumstances cast reasonable doubt on the MDO's mental capacity to determine what is in his or her best interests." The court found that because counsel had likely informed Blackburn of his rights and there was no indication he disagreed with counsel's decision to waive a jury trial, Blackburn could not meet his burden to show error. Further, even if Blackburn could establish error, he could not establish prejudice in light of Dr. Perry's uncontested adverse testimony.

Finally, the Court of Appeal observed: "The best assurance of compliance is a record that reflects it." Accordingly, the court created a prospective rule for lower courts requiring that, when a trial court conducts a bench trial to extend an MDO defendant's commitment without receiving a personal waiver from the

4

defendant, the record must reflect the facts establishing the defendant's awareness of the right to a jury and the validity of counsel's waiver. Alternatively, the record must contain an advisement and waiver form signed by the defendant.

We granted review in this case and in the companion case of *People v. Tran* (Aug. 17, 2015, S211329) ___ Cal.4th ___, which presents similar issues in the context of commitment extension proceedings for persons found not guilty of a criminal offense by reason of insanity. (§ 1026.5, subd. (b).)

## II.

"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty." (*Addington v. Texas* (1979) 441 U.S. 418, 425 (*Addington*); see *Foucha v. Louisiana* (1992) 504 U.S. 71, 80; *Humphrey v. Cady* (1972) 405 U.S. 504, 509 [commitment to a mental hospital produces "a massive curtailment of liberty"]; *People v. Barrett* (2012) 54 Cal.4th 1081, 1098 (*Barrett*) ["civil commitment for any purpose can affect liberty and other vital interests"].) "Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." (*Addington*, at pp. 425–426; see *Vitek v. Jones* (1980) 445 U.S. 480, 492 ["The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement."]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223 [involuntary "confinement in a mental hospital . . . deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation"].)

At the same time, a civil commitment proceeding is not a criminal proceeding, even though it is often collateral to a criminal trial. We have recognized that some constitutional protections available in the criminal context

5

apply as a matter of due process to defendants in certain commitment proceedings. (See *People v. Allen* (2008) 44 Cal.4th 843, 870 (*Allen*) [defendant in sexually violent predator (SVP) proceeding has due process right to testify over the objection of counsel]; *People v. Burnick* (1975) 14 Cal.3d 306, 322–323 (*Burnick*) [requirement of proof beyond a reasonable doubt]; *People v. Feagley* (1975) 14 Cal.3d 338 (*Feagley*) [jury verdict must be unanimous].)  But we have also found various constitutional protections inapplicable.  (See *People v. McKee* (2010) 47 Cal.4th 1172, 1193–1195 (*McKee*) [SVP commitment statute is not punitive and thus does not violate ex post facto clause]; *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 539 [due process does not require independent appellate review of whether there is any arguable issue on appeal from the imposition of a conservatorship]; see also *Kansas v. Hendricks* (1997) 521 U.S. 346, 369 [initiation of civil commitment proceeding "does not constitute a second prosecution" for double jeopardy purposes].)

In *In re Gary W.* (1971) 5 Cal.3d 296, a case involving the extension of confinement of a minor ward of the California Youth Authority, we observed that "[t]he right to a jury trial in an action which may lead to . . . involuntary confinement" is "fundamental" (*id.* at p. 306) and emphasized that when individuals are "threatened with involuntary confinement, [the right to a jury trial is] equally important whether the threat of confinement originates in a civil action or a criminal prosecution" (*id.* at p. 307).  However, we have not previously addressed whether a mentally disordered offender has a constitutional right to a jury trial in a commitment extension proceeding, and we do not address that question here.  In the wake of decisions of this court finding various due process guarantees applicable to certain commitment proceedings (see *In re Moye* (1978) 22 Cal.3d 457, 467; *Burnick*, *supra*, 14 Cal.3d at pp. 324–325; *Feagley*, *supra*, 14 Cal.3d at p. 350), the Legislature enacted the MDO statute in 1985, setting forth

6

procedural protections generally available only in the criminal context, including the right to a jury trial.  (Stats. 1985, ch. 1418, § 1, pp. 5009–5010.)  The Legislature later moved these protections to sections 2966 and 2972.  (Stats. 1986, ch. 858, §§ 4, 7, pp. 2953–2956.)  The MDO commitment scheme has thus been described as "something of a hybrid, a civil hearing with criminal procedural protections."  (*People v. Montoya* (2001) 86 Cal.App.4th 825, 830 (*Montoya*); see *People v. Harrison* (2013) 57 Cal.4th 1211, 1229 ["Although a civil commitment proceeding is not criminal in nature, it does afford the prisoner many of the protections of a criminal defendant . . . ."].)

In *People v. Masterson* (1994) 8 Cal.4th 965 (*Masterson*), we held that counsel can waive the right to a jury trial, "even over the defendant's objection," in a proceeding under section 1368 to determine a defendant's competence to stand trial.  (*Masterson*, at p. 974.)  Our reasoning in *Masterson* provides guidance on the proper analytical approach to the case before us.  There we began by citing the general proposition that " 'counsel is captain of the ship' " and has authority to bind the client in procedural aspects of litigation.  (*Id.* at p. 969.)  But we did not rely on that general proposition to resolve the case, nor did we "decide whether . . . there are some statutory rights that counsel may not waive."  (*Id.* at p. 970.)  "Rather," we said, "we base our conclusion upon an examination of the nature of competency proceedings as well as the jury trial right at issue."  (*Id.* at pp. 970–971.)

In addition to noting that the right to a jury trial in a competency proceeding "is statutory, not constitutional," we observed in *Masterson* that the applicable statutes neither require an advisement nor address the issue of waiver.  (*Masterson*, *supra*, 8 Cal.4th at p. 969, citing §§ 1368, 1369).  We explained: "The sole purpose of a competency proceeding is to determine the defendant's present mental competence, i.e., whether the defendant is able to understand the

7

nature of the criminal proceedings and to assist counsel in a rational manner. (Pen. Code, § 1367; [citations].)  Because of this, the defendant necessarily plays a lesser personal role in the proceeding than in a trial of guilt.  How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?" (*Masterson*, at p. 971.)  Crucial to our reasoning was the fact that " '[a] section 1368 hearing is held only after there has been a prima facie showing of mental incompetence.' " (*Id.* at p. 972; see *id.* at p. 974 ["the court here declared a doubt as to defendant's competence"]; former § 1367.1, subd. (a), added by Stats. 1992, ch. 722 and repealed by Stats. 2014, ch. 759 [judicial finding based on "the defendant's behavior or other evidence" that "there is reason to believe that the defendant is mentally disordered and as a result may be incompetent to stand trial" is a prerequisite to a section 1368 competency hearing].)  " 'Of necessity, therefore, defendant's attorney must play a greater role in making fundamental choices for him, and cannot be expected to seek approval of strategic decisions made in the course of obtaining and presenting proof of incompetence.' " (*Masterson*, at p. 972.)

Thus, *Masterson* focused on the particular statutory scheme and nature of the " 'special proceeding' " at issue. (*Masterson*, *supra*, 8 Cal.4th at p. 969.)  The statutes at issue in *Masterson* make clear that there has already been a prima facie showing of incompetence by the time a defendant faces a competency hearing, and thus it is sensible that counsel's decisions may trump the defendant's.  In resolving the present case, we focus our attention on the statutory scheme for extending an MDO defendant's commitment and on the nature and purpose of those proceedings.

## III.

Unlike the competency hearing statutes considered in *Masterson*, the statutory scheme that governs MDO commitment proceedings expressly provides

for advisement and waiver of the right to a jury trial. We briefly describe the scheme and then focus on its specific provisions addressing the right to a jury trial.

**A.**

The Mentally Disordered Offender Act "provides that individuals convicted of certain enumerated violent offenses caused or aggravated by a severe mental disorder, and who pose a substantial threat of harm to others, may be required to receive mental health treatment as a condition of parole." (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1057 (*Lopez*); see *McKee*, *supra*, 47 Cal.4th at pp. 1201–1202.) An MDO commitment is neither penal nor punitive; it has "the dual purpose of protecting the public while treating severely mentally ill offenders." (*Lopez*, at p. 1061.) "Any commitment under this article places an affirmative obligation on the treatment facility to provide treatment for the underlying causes of the person's mental disorder." (§ 2972, subd. (f).)

A mentally disordered offender may be involuntarily committed at three different stages: as a condition of parole (§ 2962), in conjunction with the extension of parole (§ 2966, subd. (c)), and following release from parole (§§ 2970, 2972). (See *Lopez*, *supra*, 50 Cal.4th at pp. 1061–1062.) At issue in this case is the third stage.

The district attorney may seek continued treatment and commitment of a mentally disordered offender beyond the termination of parole by filing a petition in the superior court alleging that the individual suffers from a severe mental disorder that is not in remission and that he or she poses a substantial risk of harm to others. (§ 2970.) Section 2972(a) sets forth the procedures applicable to a hearing on such a petition. Its full text, with italics identifying the two sentences central to this dispute, reads: "The court shall conduct a hearing on the petition under Section 2970 for continued treatment. *The court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial.*

9

The attorney for the person shall be given a copy of the petition, and any supporting documents. The hearing shall be a civil hearing, however, in order to reduce costs the rules of criminal discovery, as well as civil discovery, shall be applicable. [¶] The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. *The trial shall be by jury unless waived by both the person and the district attorney.* The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown." (§ 2972(a), italics added.) The same protections apply to a hearing in the superior court on a petition challenging an MDO commitment at either of the other two phases, except that a hearing must be conducted "within 60 calendar days after the petition is filed, unless either time is waived by the petitioner or his or her counsel, or good cause is shown." (§ 2966, subd. (b) (hereafter section 2966(b)).)

**B.**

We review de novo questions of statutory construction. (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387.) In doing so, " 'our fundamental task is "to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." ' " (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.) We begin with the text, "giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation]." (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529–530 (*Pineda*).) "If no ambiguity appears in the statutory language, we presume that the Legislature meant what it said, and the plain meaning of the statute controls." (*People v. Gray* (2014) 58 Cal.4th 901, 906.)

We first address whether the trial court erred in failing to advise Blackburn of his right to a jury trial. The advisement provision states: "The court shall

10

advise the person of his or her right to be represented by an attorney and of the right to a jury trial." (§ 2972(a).) The meaning of this text is unambiguous. The court must advise the defendant of the right to counsel and the right to a jury trial. And the court must make this advisement to "the person," not to his or her attorney. This plain meaning is confirmed by the very next sentence of section 2972(a), which distinguishes between "the person" and his or her "attorney." (*Ibid.* ["The attorney for the person shall be given a copy of the petition, and any supporting documents."].)

The Attorney General argues that when counsel is present, the required advisement is "moot" because counsel is obligated to advise the client of his or her rights. But the statutory mandate contains no mootness exception. Moreover, because mentally disordered offenders have not only a right to counsel but a right to appointed counsel in case of indigence (§ 2972, subd. (b)), the Attorney General's view would suggest that the Legislature intended the advisement provision to apply only when a defendant chooses to represent himself or herself and is sufficiently competent to do so. We find this narrow inference of legislative intent improbable in light of the statute's unqualified directive.

It may be argued that it is sufficient for the trial court to give the advisement to counsel, who is then obligated to advise the client. But this, too, would empty the advisement provision of meaningful content, for it is hard to see what purpose would be served by advising counsel when counsel is already presumed to know the law. (See *Tubbs v. Southern Cal. Rapid Transit Dist.* (1967) 67 Cal.2d 671, 679.) The Legislature saw fit to include the statutory provision requiring an advisement even though MDO defendants are often represented by counsel and even though counsel is presumed to know the defendant's rights and is obligated to advise the defendant accordingly. The meaning of the provision is clear. As the Court of Appeal explained, "[i]t reflects

11

a legislative intent to judicially ensure that 'the person' knows that he or she has the right to a jury trial." We conclude that section 2972(a) requires the trial court to directly advise the MDO defendant on the record in a court proceeding.

In this case, the record does not indicate that the trial court advised Blackburn of his right to a jury trial as section 2972(a) requires. This omission was error.

## C.

We next address whether section 2972(a)'s waiver provision requires an MDO defendant to personally waive his or her right to a jury trial before the court may hold a bench trial. We again begin with the text, "giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation]." (*Pineda*, *supra*, 51 Cal.4th at pp. 529–530.) The waiver provision says: "The trial shall be by jury unless waived by both the person and the district attorney." (§ 2972(a).)

In construing these words, we recognize that in ordinary civil actions, the "general rule" is that counsel has authority to bind the client in virtually all aspects of litigation, including waiver of the state constitutional right to a jury trial. (*In re Horton* (1991) 54 Cal.3d 82, 95; see *id.* at p. 95 ["counsel is captain of the ship"]; *Zurich G. A. & L. Ins. Co., Ltd. v. Kinsler* (1938) 12 Cal.2d 98, 105; Code Civ. Proc., § 283, subd. 1.) Commitment proceedings, however, are not ordinary civil actions; they are " 'special proceedings of a civil nature.' " (*In re Gary W.*, *supra*, 5 Cal.3d at p. 309; see *People v. Yartz* (2005) 37 Cal.4th 529, 536.) And they threaten the possibility of "a significant deprivation of liberty." (*Addington*, *supra*, 441 U.S. at p. 425.) As in *Masterson*, we train our attention on the text and purpose of the particular statutes that govern this special proceeding to determine whether the decision to waive a jury trial must be made by the defendant or may be made by counsel notwithstanding the defendant's wishes.

Ultimately, we construe the waiver provision of section 2972(a) to establish a default rule that a court must obtain a personal waiver of the defendant's right to a jury trial before holding a bench trial. But when the trial court finds substantial evidence that defendant lacks the capacity to make a knowing and voluntary waiver, control of the decision shifts to defense counsel.

**1.**

Several considerations suggest that section 2972(a) gives the defendant, not counsel, primary control over the waiver decision. First, as explained above, the first two usages of "the person" in section 2972(a) refer specifically to the defendant and cannot be read to mean "the defendant or his or her attorney." The third usage of "the person" in section 2972(a) appears in the waiver provision, and "it is generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute." (*People v. Dillon* (1983) 34 Cal.3d 441, 468 (*Dillon*).)

Second, reading the waiver provision together with the advisement provision, as we must, confirms that the waiver decision belongs to the defendant in the first instance. The purpose of an advisement is to inform the defendant of a particular right so that he or she can make an informed choice about whether to waive that right. (See *Barrett*, *supra*, 54 Cal.4th at p. 1105 ["[A]bsent any requirement of a personal waiver, the person facing commitment has no need for an express court advisement of the right to request a jury trial."]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1070 [purpose of admonitions under *Faretta v. California* (1973) 422 U.S. 806 is "to ensure a clear record of a defendant's knowing and voluntary waiver of counsel"].) If the Legislature had intended to allow counsel to waive a jury trial notwithstanding the defendant's wishes, it would not have needed to require the trial court to expressly advise the defendant. As the Court of

13

Appeal explained, the purpose of the mandatory advisement is "to inform the MDO of the right to a jury trial so that he or she can decide whether to waive it."

Third, we note that in various provisions other than those describing trial procedures in sections 2966(b) and 2972(a), the MDO statute distinguishes between "the person," "the patient," or "the prisoner" and his or her attorney or representative. (See §§ 2964, subd. (a) [when an MDO defendant returns to a facility, a hearing must be held within 15 days "unless the patient or the patient's attorney agrees to a continuance"], 2964, subd. (b) ["the prisoner or any person appearing on his or her behalf" can request the appointment of psychological professionals], 2966, subd. (a) [same], 2972.1, subd. (c)(1) ["both defense counsel and the person on outpatient status shall sign and return to the court a form" concerning continued treatment], 2972.1, subd. (c)(2) ["If the person on outpatient status refuses or is unable to sign the form, his or her counsel shall indicate, in writing, that the form . . . [was] explained to the person and the person refused or was unable to sign the form."].) Again, we presume the Legislature intended such usage to have consistent meaning throughout the same statute. (See *Dillon*, *supra*, 34 Cal.3d at p. 468.)

The Court of Appeal contrasted Penal Code section 2972(a) with Welfare and Institutions Code section 1801.5, which provides for a trial by jury in proceedings to extend the commitment of a juvenile who is "physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality which causes the person to have serious difficulty controlling his or her dangerous behavior," unless the right is "*personally waived*." (Italics added.) The court concluded that, since the Legislature used the phrase "personally waived" in Welfare and Institutions Code section 1801.5, but not in section 2972(a), it must not have intended section 2972(a) to require a personal waiver. But two considerations argue against an inference that the Legislature intended the

14

waiver procedures for juvenile offenders to be different from those for adult mentally disordered offenders.

First, the legislative history of Welfare and Institutions Code section 1801.5 suggests that the Legislature did not intend the language of personal waiver to be a departure from the requirements in existing civil commitment statutes. The original language of section 1801.5, enacted in 1971, provided for a right to a jury trial but did not include any mention of personal waiver. (Stats. 1971, ch. 1680, § 1, p. 3606.) When the phrase "personally waived" was added in 1998 (Stats. 1998, ch. 267, § 2, p. 1181), the legislative commentary noted: "This bill's provisions are modeled on, and are analogous to, procedures used for MDOs and [sexually violent predators]." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 2187 (1997–1998 Reg. Sess.) as amended Apr. 28, 1998, p. 7.) The Legislature thus adopted the current scheme for committing dangerous juvenile offenders on the understanding that its procedures were "modeled" on those in the MDO scheme. (*Ibid.*)

Second, to conclude that the Legislature intended mentally disordered juvenile offenders, but not mentally disordered adult offenders, to control the decision to waive a jury trial would raise serious equal protection concerns. (See *Barrett*, *supra*, 54 Cal.4th at p. 1107 ["Because of the fundamental interests at stake, equal protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics."].) Such differential treatment would be rather peculiar insofar as it suggests that *adult* mentally disordered offenders are less capable of a voluntary and intelligent waiver than similarly situated *juvenile* offenders. By construing the waiver provision of section 2972(a) to mean the defendant controls the waiver

15

decision, we avoid this constitutional concern. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373.)

**2.**

The considerations above suggest that the waiver decision belongs to the defendant in the first instance. But that is not the end of the matter because we must construe the waiver provision in light of the purpose of the MDO scheme. By its terms, the MDO statute addresses the treatment and civil commitment of offenders who suffer from a "severe mental disorder." (§ 2960.) "The term 'severe mental disorder' means an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely." (§ 2962, subd. (a)(2).) In light of this definition, we presume the Legislature was aware that many MDO defendants lack the capacity to make a knowing and voluntary waiver of their right to a jury trial, and we doubt the Legislature intended to require courts to obtain a jury trial waiver from such persons. Indeed, assigning that decision to a person who is unable to exercise it competently would undermine the purpose of the advisement and waiver provisions, for those provisions are intended to ensure that the person makes a knowing and voluntary choice about whether to waive a jury trial. (See *Pate v. Robinson* (1966) 383 U.S. 375, 384 ["it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right[s]"].)

Our cases have recognized that defendants whose competence has been called into doubt necessarily exercise a lesser degree of control over proceedings than defendants whose competence has not been called into doubt. In *Masterson*, we held that the trial court did not err when it allowed counsel to waive the requirement that the jury be composed of 12 members in a proceeding to

16

determine the defendant's competency to stand trial. (*Masterson*, *supra*, 8 Cal.4th at p. 974.) We emphasized the "respective roles of counsel and client in competency hearings," which are " 'held only after there has been a prima facie showing of mental incompetence.' " (*Id.* at p. 972.) "[I]f counsel represents a defendant as to whose competence the judge has declared a doubt sufficient to require a section 1368 hearing, he should not be compelled to entrust key decisions about fundamental matters to his client's apparently defective judgment.' " (*Ibid.*)

Similarly, we held in *Barrett* that the decision to waive a jury trial belongs solely to counsel in commitment proceedings for persons alleged to be developmentally disabled and dangerous. (*Barrett*, *supra*, 54 Cal.4th at p. 1105.) We explained that "[t]he significant cognitive and intellectual deficits that [severe developmental disability] entails, which appear early in life and never recede, affect the ability to 'make basic decisions' regarding the conduct of the [Welfare and Institutions Code] section 6500 proceeding. [Citation.] Such an individual thus plays a limited 'personal role' in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right." (*Id.* at pp. 1103–1104.) We concluded that the lack of advisement and personal waiver of the right to a jury trial in a Welfare and Institutions Code section 6500 proceeding does not violate due process of law. (*Barrett*, at p. 1105.)

The Attorney General contends that we can infer that nearly every defendant in an MDO commitment extension proceeding lacks the capacity to make a knowing and voluntary waiver from the preliminary showing required for the district attorney to file an extension petition. (See § 2970 [extension petition for an MDO defendant in a state hospital must be accompanied by a written medical evaluation finding that the defendant suffers from a severe mental disorder that "is not in remission or cannot be kept in remission" without

17

treatment].)  A similar inference led this court to conclude that counsel, in making fundamental litigation decisions, may override the wishes of a criminal defendant facing a competency hearing (*Masterson*, *supra*, 8 Cal.4th at p. 972) or a developmentally disabled person facing a commitment proceeding (*Barrett*, *supra*, 54 Cal.4th at pp. 1104–1105).  But the reasoning of those cases does not extend to mentally disordered offenders.

Instead, we have observed that many persons who suffer from mental illness or related disorders can understand the nature of legal proceedings and determine their own best interests.  In *Barrett*, we distinguished between developmental disability and mental illness in this regard.  We said developmental disability involves "cognitive and intellectual deficits" that "appear early in life and never recede" and "affect the ability to 'make basic decisions' regarding the conduct of [a legal] proceeding." (*Barrett*, *supra*, 54 Cal.4th at p. 1103.)  By contrast, "[m]ental illness and related disorders are said to be conditions that may arise suddenly and, for the first time, in adulthood." (*Id.* at p. 1108.)  "[T]he need for treatment may be temporary, and . . . disabling mental disorders may be intermittent or short-lived." (*Ibid.*)  "Where present, . . . ' "mental illness 'often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . *many mentally ill persons retain the capacity to function in a competent manner*.' " ' (*In re Qawi* (2004) 32 Cal.4th 1, 17, italics added . . . .)" (*Barrett*, at p. 1109.)  Thus, the conditions that result from a mental illness or related disorder, "though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings." (*Ibid.*; see *Conservatorship of John L.* (2010) 48 Cal.4th 131, 154 ["it may not be presumed that . . . one who has been evaluated or treated for a mental disorder [] is incompetent to waive [trial] rights"]; Welf. & Inst. Code, § 5331 ["No person may be presumed to be incompetent because he or

18

she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received."]; cf. *In re Qawi, supra*, 32 Cal.4th at p. 24 ["Although an MDO must be determined to have a 'severe mental disorder,' commitment for a mental disorder does not by itself mean that individuals are incompetent to participate in their own medical decisions."].)

By definition, every mentally disordered offender has previously been deemed competent to stand trial, and the premise of the MDO statute is that severe mental disorders are "treatable." (§ 2960; see § 2972, subd. (f) [declaring "affirmative obligation on the treatment facility to provide treatment"].) Although a petition for extended commitment must be supported by an evaluation finding that the defendant's severe mental disorder "is not in remission or cannot be kept in remission without treatment" (§ 2970, subd. (a)), we have recognized that "[t]he 'cannot be kept in remission without treatment' standard can . . . be found when a person 'has not voluntarily followed the treatment plan' during the year prior to the commitment or recommitment proceeding." (*In re Qawi*, *supra*, 32 Cal.4th at p. 24.) A defendant's compliance with treatment in advance of a commitment extension hearing may alleviate or attenuate, at least for the duration of the proceeding, any cognitive impairment associated with a particular mental disorder. The potentially transitory and treatable nature of mental illness and the potentially limited areas of functioning impaired by such illness preclude any categorical inference that an MDO defendant facing a commitment extension proceeding cannot competently decide whether to waive a jury trial.

We thus observe that the Legislature placed control of the decision to waive a jury trial in "the person" (§ 2972(a)), even as we infer that the Legislature did not intend the decision to be made by a defendant who lacks the capacity to make a knowing and voluntary waiver. In reconciling these objectives, a trial court need

19

not conduct a full-blown competency hearing. The statute does not expressly provide for such a hearing, and we are mindful of "the ' "administrative burdens" ' and 'practical difficulties' of demanding new procedures." (*Barrett*, *supra*, 54 Cal.4th at p. 1106.) In *Masterson*, we found it dispositive that " '[a] section 1368 hearing is held only after there has been a prima facie showing of mental incompetence' " and that "the court . . . declared a doubt as to defendant's competence" based on such a showing. (*Masterson*, *supra*, 8 Cal.4th at pp. 972, 974.) We adopt a similar approach here: In a section 2972(a) commitment extension hearing, the decision to waive a jury trial belongs to the defendant in the first instance, and the trial court must elicit the waiver decision from the defendant on the record in a court proceeding. But if the trial court finds substantial evidence that the defendant lacks the capacity to make a knowing and voluntary waiver, then control of the waiver decision belongs to counsel, and the defendant may not override counsel's decision. In this context, evidence is substantial when it raises a reasonable doubt about the defendant's capacity to make a knowing and voluntary waiver, and the trial court's finding of a reasonable doubt must appear on the record. (Cf. *People v. Lawley* (2002) 27 Cal.4th 102, 131; *Masterson*, at p. 974.)

In this case, Blackburn did not personally waive his right to a jury trial. Nor, as the Court of Appeal observed, does the record "establish that during the pretrial period defendant was so affected by his mental disease as to raise doubt about his capacity" to make a knowing and voluntary waiver. Accordingly, we conclude that the trial court erred in accepting counsel's waiver and holding a bench trial.

The Court of Appeal held that section 2972(a) does not require the trial court to obtain a personal waiver from the defendant. Rather, waiver by counsel must be "at the MDO's direction or with the MDO's knowledge and consent"

20

unless "the circumstances cast reasonable doubt on the MDO's mental capacity to determine what is in his or her best interests." The Court of Appeal declined to find error in this case, explaining that because counsel waived Blackburn's presence at every pretrial hearing, the trial court could "reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial hearings, including the right to a jury trial and whether to have one." The Court of Appeal added that "this was not the first extension of defendant's MDO commitment, and the record does not suggest that defendant was unaware of his right to a jury trial notwithstanding the lack of a judicial advisement. Nor does the record suggest that defendant was unaware that counsel intended to waive a jury and had done so or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver."

Unlike the Court of Appeal and our concurring and dissenting colleague (conc. & dis. opn., *post*, at pp. 2, 6–8), we decline to infer from these circumstances that Blackburn knowingly and voluntarily waived his right to a jury trial. To presume Blackburn's knowing and voluntary waiver, as the Court of Appeal did, would defeat the point of section 2972(a)'s advisement and waiver provisions. By providing a right to counsel for MDO defendants facing extended commitment, the Legislature enacted section 2972(a) on the understanding that most defendants would be represented by counsel. If counsel could waive a jury trial based on the defendant's presumed consent when the record does not expressly indicate the defendant's wishes, and even when the defendant is not present when the waiver occurs, then the Legislature would have had no need to require the trial court to advise "the person" of his or her right to a jury trial or to obtain a waiver from "the person." (§ 2972(a).) Instead, counsel would be authorized to make the waiver decision, and the onus would be on the defendant to prove lack of consent. But that is not the scheme the Legislature enacted. Section

21

2972(a) makes clear that "[t]he trial *shall* be by jury *unless* waived by both the person and the district attorney." (Italics added.) The statute does not require the defendant to affirmatively show he or she wanted a jury trial; a jury trial is the default procedure absent a personal waiver. In sum, the trial court must elicit the waiver decision from the defendant in a court proceeding unless it finds substantial evidence of incompetence, in which case counsel controls the waiver decision.

**3.**

Our holding today is consistent with the result, if not the reasoning, of *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Otis*), which upheld the trial court's acceptance of counsel's jury trial waiver over the objection of an MDO defendant. The defendant in that case showed signs of cognitive impairment at the commitment hearing: "Otis . . . told the court that invisible police had been sexually assaulting him and were sexually assaulting him as he spoke to the court. The court stated for the record that Otis was not being assaulted in court." (*Id.* at pp. 1175–1176.) The trial court's direct observation of Otis provided ample basis to doubt that he was capable of making a knowing and voluntary waiver decision. (*Id.* at p. 1177.)

We agree with *Otis* that "[t]he Legislature must have contemplated that many persons, such as Otis, might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of such a person." (*Otis*, *supra*, 70 Cal.App.4th at p. 1177.) However, we disapprove *Otis*, *supra*, 70 Cal.App.4th 1174, and *Montoya*, *supra*, 86 Cal.App.4th 825, to the extent they hold that control of the waiver decision in an MDO commitment hearing invariably belongs to counsel. That conclusion sweeps too broadly in light of the Legislature's focus on "the person" in section 2972(a)'s advisement and waiver provisions as well as the potentially transitory, treatable,

22

and variable nature of cognitive impairments that may afflict mentally disordered offenders.

## IV.

Having found that the trial court erred in accepting counsel's waiver of Blackburn's right to a jury trial, we now consider the appropriate remedy.

When "state standards alone have been violated, the State is free . . . to apply its own state harmless-error rule to such errors of state law." (*Cooper v. California* (1967) 386 U.S. 58, 62.) California's harmless error rule is set forth in article VI, section 13 of our state Constitution. In *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), we made clear that a defendant who has established state-law error must typically demonstrate that "it is reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*Id.* at p. 836.) "As we have explained, however, 'under the California constitutional harmless-error provision some errors . . . are not susceptible to the "ordinary" or "generally applicable" harmless-error analysis — i.e., the *Watson* "reasonably probable" standard — and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case.' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 699 (*Lightsey*).)

The latter rule is consistent with the language of article VI, section 13, whose phrase "miscarriage of justice" encompasses not only errors affecting the outcome of the case, but also certain procedural errors that may or may not have affected the outcome. As this court explained in *People v. O'Bryan* (1913) 165 Cal. 55 (*O'Bryan*) two years after our state harmless error rule was adopted: "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure,

in which the substantial rights belonging to defendants shall be respected.  For example, if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt." (*Id.* at pp. 65–66.)

We have not previously determined the correct approach to review when a trial court fails to obtain a valid jury trial waiver from an MDO defendant and thereby denies the defendant his or her statutory right to a jury trial on the entire cause in a civil commitment proceeding.  As explained below, we hold that the erroneous denial of a jury trial in this context is a "miscarriage of justice" within the meaning of article VI, section 13 and requires reversal without inquiry into the strength of the evidence in a particular case.

This court and the high court have applied harmless error analysis to a wide range of errors and have recognized that most errors can be harmless.  (See *Allen*, *supra*, 44 Cal.4th at p. 872; *Arizona v. Fulminante* (1991) 499 U.S. 279, 306 (*Fulminante*).)  But we have explained that certain errors, which operate to deny a defendant an " 'orderly legal procedure' " (*People v. Cahill* (1993) 5 Cal.4th 478, 501 (*Cahill*)), can entail a "miscarriage of justice" under article VI, section 13.  In *Lightsey*, we held that a trial court's failure to appoint counsel to represent a defendant during a mental competency proceeding, in violation of section 1368, was automatically reversible because it was " 'analogous to' " the " 'total deprivation of the right to counsel at trial.' ([*Fulminante*, *supra*, 499 U.S. at p. 309].)" (*Lightsey*, *supra*, 54 Cal.4th at p. 699.)  We observed that the defendant "was completely deprived of the assistance of counsel at a critical stage of the trial proceedings in violation of section 1368.  As with a pervasive Sixth Amendment violation, the statutory violation here cannot be likened to 'trial error' . . . .  We cannot simply excise some item of evidence in order to 'make an intelligent

judgment' [citation] about whether the competency determination might have been affected by the absence of counsel to represent defendant. . . . Attempting to assess the effect of the absence of counsel on the trial court's finding of competence is, in truth, no different than attempting to assess the effect on a jury's final verdict of the absence of counsel during a trial on substantive charges: there is no reasoned manner in which to do so because the lack of true adversarial testing denied defendant the basic procedure by which his competence should have been determined." (*Id.* at p. 701.) We thus concluded that the denial of the defendant's right to counsel under section 1368 automatically required reversal. (*Lightsey*, at pp. 699, 702.)

If the case now before us were a criminal matter involving the invalid waiver of a state or federal constitutional jury trial right, there could be no doubt that the error would constitute a "miscarriage of justice" requiring reversal without regard to the strength of the evidence. Under settled law, "a judgment in a criminal case resulting from a court trial must be reversed if the defendant did not expressly waive the right to a trial by jury." (*People v. Ernst* (1994) 8 Cal.4th 441, 443 (*Ernst*).) In *Ernst*, we held that the trial court erroneously deprived the defendant of a jury trial where the defendant himself never expressly waived the right, even though counsel stated that the defendant was prepared to waive the right and, at a subsequent proceeding, indicated that the right had been waived. (*Id.* at p. 446.) We observed that absent an express waiver by a defendant, trial to a court deprives the defendant of a jury trial, and reversal is required. (*Id.* at p. 448.) Similarly, in *People v. Collins* (2001) 26 Cal.4th 297 (*Collins*), we held that the defendant's jury trial waiver was invalid because the trial court had obtained the waiver by assuring the defendant of an unspecified benefit. (*Id.* at p. 312.) We then explained that "a harmless error standard does not, and cannot, apply" because "the right to a jury trial is fundamental, and its denial . . . result[s]

25

in a 'miscarriage of justice' within the meaning of California Constitution, article VI, section 13, and requir[es] that the judgment of conviction be set aside." (*Id.* at p. 311.)

The failure to obtain a valid jury trial waiver defies ordinary harmless-error analysis. To speculate about whether a defendant would have chosen a jury trial if he or she had been in a position to make a personal choice would pose insurmountable difficulties, as would an inquiry into what effect, if any, that choice would have had on the outcome of the trial. As we said in *Collins*, "where a case improperly is tried to the court rather than to a jury, there is no opportunity meaningfully to assess the outcome that would have ensued in the absence of the error." (*Collins*, *supra*, 26 Cal.4th at p. 313.) Accordingly, we treat a trial court's failure to obtain a required personal jury trial waiver as tantamount to the denial of a jury trial, and as such, it constitutes a "miscarriage of justice" under article VI, section 13. (See *People v. Breverman* (1998) 19 Cal.4th 142, 174 (*Breverman*) ["In rare instances involving 'fundamental "structural defects" ' [citation] in a criminal proceeding (for example, the complete denial of the right to a jury, or to an impartial judge), it may be impossible, or beside the point, to evaluate the resulting harm by resort to the trial record, and a miscarriage of justice may arise regardless of the evidence."]; *Cahill*, *supra*, 5 Cal.4th at p. 491 ["in some contexts — for example, the erroneous denial of a defendant's right to jury trial — an error may result in a miscarriage of justice, and require reversal, regardless of the strength of the evidence properly received at trial"].)

Although we have not held that mentally disordered offenders have a state or federal constitutional right to a jury trial in commitment extension proceedings, this court and the high court have long recognized that such proceedings threaten the possibility of lasting stigma and a significant deprivation of liberty. (*Ante*, at p. 5.) In enacting section 2972, the Legislature was cognizant of these

26

consequences and sought to afford defendants in MDO commitment proceedings various procedural protections to which criminal defendants are entitled, including the right to a jury trial, the right to a unanimous jury verdict, and the right to be committed by proof beyond a reasonable doubt. (*Ante*, at pp. 6–7.) Accordingly, the MDO commitment scheme is best understood as "a civil hearing with criminal procedural protections" (*Montoya*, *supra*, 86 Cal.App.4th at p. 830), and we find it significant for purposes of determining the applicability of harmless error analysis that the Legislature set forth protections in section 2972 that are borrowed directly from the criminal context. In an MDO commitment proceeding, as in a criminal trial, the "jury guarantee" is a basic protection "whose precise effects are unmeasurable" and whose denial "def[ies] analysis by 'harmless-error' standards." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281.) Accordingly, the total deprivation of a jury trial without a valid waiver in an MDO commitment proceeding requires automatic reversal.

In urging the applicability of *Watson*'s harmless error test, the Attorney General relies on *People v. Epps* (2001) 25 Cal.4th 19 (*Epps*). In *Epps*, after a jury found the defendant guilty of various offenses, the trial court dismissed the jury and, in a bench trial, found true several prior conviction allegations. (*Id.* at p. 22.) We held that the trial court erred under section 1025 in denying the defendant a jury trial on the prior conviction allegations. (*Epps*, at pp. 23–28.) We then observed: "When a state need not provide a jury trial at all, it follows that the erroneous denial of that right does not implicate the federal Constitution. [Citations.] Moreover, because the error is purely one of state law, the *Watson* harmless error test applies. (See, e.g., *People v. Breverman* (1998) 19 Cal.4th 142, 172, 178; see also Cal. Const., art. VI, § 13.)" (*Id.* at p. 29.) We found the error harmless because the evidence of the prior convictions was uncontradicted, but we

expressly reserved the question whether "we would find harmless error in a case involving contested factual questions." (*Id.* at p. 30.)

The Attorney General reads *Epps* to hold that the *Watson* harmless error standard is the sole test for determining whether a purely state law error warrants reversal under article VI, section 13. But *Epps*'s brief treatment of harmless error did not discuss or purport to abrogate our settled law distinguishing between errors that are and are not automatically reversible under article VI, section 13. (See *People v. Anzalone* (2013) 56 Cal.4th 545, 553; *Lightsey*, *supra*, 54 Cal.4th at p. 699.) Instead, *Epps* cited *Breverman*, which itself recognized that some errors of state law require automatic reversal and mentioned the complete denial of a jury trial in a criminal case as an example. (*Breverman*, *supra*, 19 Cal.4th at p. 174.)

*Epps* and *Breverman*, along with *People v. Wims* (1995) 10 Cal.4th 293 (*Wims*), applied *Watson*'s harmless error standard to the erroneous denial of a jury determination of certain limited matters in a criminal jury trial. In *Breverman*, the trial court's jury instructions erroneously omitted instructions on a heat of passion theory of the lesser included offense of voluntary manslaughter. (*Breverman*, *supra*, 19 Cal.4th at pp. 153–162.) We said "the failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone" and, citing *Wims*, held that such misinstruction is "subject . . . to the *Watson* harmless error test." (*Breverman*, at pp. 165, 171.) In *Wims*, the trial court violated the defendant's statutory right to a jury determination on allegations of use of a deadly and dangerous weapon when it failed to instruct the jury on the factual elements the prosecution was required to prove. (*Wims*, at pp. 302–303.) We observed that the *Watson* test "is 'generally applicable under current California law' " and, upon reviewing the evidence, concluded it was not reasonably probable that the jury would have found the weapon use allegation untrue. (*Wims*, at p. 315.)

Whereas *Wims*, *Breverman*, and *Epps* each applied the *Watson* test to the erroneous denial of a jury determination of certain limited matters in a criminal jury trial, the issue before us involves a trial court's acceptance of an invalid waiver that *completely* deprives an MDO defendant of his or her right to a jury trial under section 2972(a). As in *Lightsey*, the error here is one " 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " (*Lightsey*, *supra*, 54 Cal.4th at p. 700.) Such error denies the defendant "the basic procedure by which" the validity of his or her commitment "should have been determined" under a statutory scheme whose protections are borrowed directly from the criminal context. (*Id.* at p. 701.) We therefore conclude that when a trial court errs in completely denying an MDO defendant the right to a jury trial under section 2972(a), the error requires automatic reversal. We disapprove *People v. Wrentmore* (2011) 196 Cal.App.4th 921, 928–929, and *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1275–1276, to the extent they are inconsistent with this opinion.

The concept of harmless error does have applicability in this context in the following limited sense. A trial court's acceptance of counsel's waiver without an explicit finding of substantial evidence that the defendant lacked the capacity to make a knowing and voluntary waiver may be deemed harmless if the record affirmatively shows that there was substantial evidence that the defendant lacked that capacity at the time of counsel's waiver. (See, e.g., *ante*, at p. 22 [discussing *Otis*].) In addition, a trial court's failure to properly advise an MDO defendant of the right to a jury trial does not by itself warrant automatic reversal. Instead, a trial court's acceptance of a defendant's personal waiver without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary. (Cf. *People v. Howard* (1992) 1 Cal.4th 1132, 1178; *Barrett*, *supra*, 54

29

Cal.4th at p. 1114 (conc. & dis. opn. of Werdegar, J.) [finding advisement error harmless]; *id.* at pp. 1151–1152 (conc. & dis. opn. of Liu, J.) [same].) In both scenarios, the requirement of an *affirmative* showing means that no valid waiver may be presumed from a silent record. (*Ante*, at pp. 21–22.) Ultimately, we emphasize that the most certain means of ensuring a valid waiver is careful compliance with the express advisement and waiver process explained in this opinion.

## V.

As noted, our decision today rejects the rule previously set forth in *Otis*, *supra*, 70 Cal.App.4th 1174, and *Montoya*, *supra*, 86 Cal.App.4th 825, that counsel invariably controls the decision to waive a jury trial in an MDO commitment proceeding. In this case, the trial court and the parties may have reasonably relied on that prior law in proceeding with a bench trial without making a record of Blackburn's personal waiver or his inability to make a knowing and voluntary waiver. Accordingly, we remand this case to the Court of Appeal with directions to remand to the trial court so that the district attorney may submit evidence, if any, that Blackburn personally made a knowing and voluntary waiver or that he lacked the capacity to make a knowing and voluntary waiver at the time of counsel's waiver. If the trial court finds by a preponderance of the evidence that Blackburn made a knowing and voluntary waiver, or if it finds substantial evidence that he lacked that capacity at the time of counsel's waiver, then the court shall reinstate the extension order. This approach applies to all cases presently on direct appeal where the record does not reveal whether an MDO defendant personally waived his or her right to a jury trial or whether there was substantial evidence that the defendant lacked the capacity to make a knowing and voluntary waiver at the time of counsel's waiver.

30

**CONCLUSION**

For the reasons above, we reverse the judgment of the Court of Appeal upholding the extension order and remand for proceedings not inconsistent with this opinion.

**LIU, J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

31

**CONCURRING OPINION BY LIU, J.**

The court holds that when a trial court errs in completely denying a mentally disordered offender (MDO) the right to a jury trial under Penal Code section 2972, subdivision (a), the error requires automatic reversal. (Maj. opn., *ante*, p. 29.) In a companion case filed today, we adopt the same reversal rule when a trial court errs in denying a defendant found not guilty by reason of insanity (NGI) the right to a jury trial under Penal Code section 1026.5, subdivision (b). (*People v. Tran* (Aug. 17, 2015, S211329) __ Cal.4th __, __ [at p. 2] (*Tran*).)

The Chief Justice dissents from these holdings, observing that "as a general matter" article VI, section 13 of the California Constitution (section 13) as interpreted in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) authorizes reversal of a judgment only upon a finding of prejudice. (Conc. & dis. opn., *post*, at p. 5; see *Tran*, *supra*, __ Cal.4th at p. __ [slip opn. at p. 4] (conc. & dis. opn. of Cantil-Sakauye, C.J.).) Of course, the qualifier is all-important here. The court's opinions today do not dispute that the *Watson* standard applies *as a general matter*; they instead conclude that the erroneous denial of a jury trial in an MDO or NGI commitment extension proceeding falls outside the general rule. To provide further context for today's opinions, and because the applicability of harmless error doctrine is a recurring issue in appellate adjudication, I briefly review the text, history, and purpose of section 13.

1

Section 13 says: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." The text does not say an appellate court may reverse a judgment only when an error affected the outcome. Instead, the text says a judgment may not be reversed unless an error resulted in a "miscarriage of justice." (§ 13.) To the extent that the conception of justice embodied in our state Constitution encompasses concerns beyond the outcomes of cases, section 13 contemplates that some errors are reversible on grounds other than their likely effect on the outcome of a particular case.

The legislative history of section 13 confirms the meaning that the text implies. Section 13 was adopted in 1966 as part of a general reorganization of the California Constitution. It derives from former article VI, section 4 1/2 (former section 4 1/2), which was added to the California Constitution in 1911 when the voters approved Senate Constitutional Amendment No. 26. Before the addition of former section 4 1/2, appellate courts had restricted their role to reviewing pure questions of law. They did not review the facts underlying judgments to determine whether they supported a conviction in spite of an error at trial. (Voter Information Guide, Special Elec. (Oct. 10, 1911) argument in favor of Sen. Const. Amend. No. 26, p. 12 (1911 Voter Information Guide).) Consequently, most trial errors were reviewed under the functional equivalent of an automatic reversal rule. The addition of former section 4 1/2 to the California Constitution changed the role of appellate courts by requiring review of "the entire cause including the evidence" and permitting reversal only after finding a "miscarriage of justice."

2

In the 1911 Voter Information Guide, the proposed amendment's sponsor, Senator Boynton, said: "The object of this amendment is to enable our courts of last resort to sustain verdicts in criminal cases unless there has been a miscarriage of justice, or, putting it in another way, its purpose is to render it unnecessary for the higher courts to grant the defendant in a criminal case a new trial for unimportant errors. It is designed to meet the ground of common complaint that criminals escape justice through technicalities." (1911 Voter Information Guide, *supra*, argument in favor of Sen. Const. Amend. No. 26, p. 11.) Senator Boynton then provided the following examples of the "absurd lengths" to which courts had gone in reversing "immaterial errors": "In Missouri a case was reversed and the prisoner escaped conviction because the indictment alleged the deceased 'instantly died' instead of charging according to the ancient formula that he 'did then and there die.' In a Texas case the elimination of the letter 'r' from the word 'first' saved a murderer from the gallows, when his guilt was absolutely determined. In our own state a conviction for murder was set aside because the indictment failed to state that the man killed was a human being." (*Id.* at p. 12.) These comments, which were provided to the voters before they ratified the proposed amendment, suggest that the enactment of former section 4 1/2 was directed at trivial errors and was not meant or understood to provide that only an error affecting the outcome of a trial would qualify as a miscarriage of justice.

Shortly after the enactment of former section 4 1/2, our decision in *People v. O'Bryan* (1913) 165 Cal. 55 (*O'Bryan*) explained how it had altered the California Constitution. *O'Bryan* concluded that the trial court had violated the defendant's state constitutional right not to be compelled to be a witness against himself. We then considered whether the conviction should be reversed, noting that "[t]his question must be answered with due regard to the terms of section 4 1/2 of article VI, added to the constitution by amendment adopted in 1911." (*Id.*

3

at p. 63.)  After explaining the legal background against which the voters adopted former section 4 1/2, we said that former section 4 1/2 "must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law." (*Id.* at p. 65.)

Importantly, we continued:  "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty.  It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.  For example, if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt. . . .  [I]t would hardly be suggested that because he was in fact guilty, no 'miscarriage of justice' had occurred." (*O'Bryan*, *supra*, 165 Cal. at pp. 65–66.)  As *O'Bryan* makes clear, the contemporaneous understanding of former section 4 1/2 was that certain types of error would result in a miscarriage of justice even when the evidence convincingly established the reliability of the outcome of the case.  And one example of such error was the complete denial of a jury trial on a felony charge.

In 1914, the voters approved Senate Constitutional Amendment No. 12, which amended former section 4 1/2 by extending the "miscarriage of justice" standard to civil cases.  The amendment did not call into question our construction of that provision in *O'Bryan*.  Indeed, as with Senate Constitutional Amendment No. 26, the sponsor of the 1914 amendment, Senator Boynton, explained that it "is designed to prevent the reversal of civil cases by courts of appeal on purely technical grounds.  [¶] . . . .  [¶] . . . In scores of cases appellate judges have

4

reluctantly set aside meritorious decisions on no other grounds than that during a long and heated trial, counsel for the successful party committed some technical breach of legal procedure." (Voter Information Guide, Gen. Elec. (Nov. 3, 1914) arguments in favor of Sen. Const. Amend. No. 12, p. 4.)

Our case law has consistently treated *O'Bryan* as the seminal authority on the meaning of former section 4 1/2. (See, e.g., *People v. Collins* (1976) 17 Cal.3d 687, 697–698, fn. 5; *People v. Sarazzawski* (1945) 27 Cal.2d 7, 11; *Vallejo etc. R.R. Co. v. Reed Orchard Co.* (1915) 169 Cal. 545, 553–554; *People v. Fleming* (1913) 166 Cal. 357, 381.) Most notable is our discussion of *O'Bryan* in our frequently cited *Watson* decision. In that case, the defendant wore his Army uniform during trial. During cross-examination of the defendant, the prosecution pursued a line of questioning intended to show that he had taken gymnasium classes to "stretch his height beyond the 6 feet 6 inch limit fixed by the Army . . . so he could be discharged from further Army service." (*Watson*, *supra*, 46 Cal.2d at p. 833.) The prosecution argued that the defendant was wearing his Army uniform in court to gain sympathy and respect for his patriotic service, and the inquiry would serve to rebut this effect. We held that the trial court erred by improperly overruling an objection to the prosecution's line of questioning. (*Id.* at pp. 833–834.)

We then addressed whether the error constituted a "miscarriage of justice" under former section 4 1/2. Summarizing *O'Bryan*, we said that "*generally*" a showing of prejudice is required for reversal and that "*ordinarily* where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered." (*Watson*, *supra*, 46 Cal.2d at p. 835, italics added.) At the same time, we said that "certain fundamental rights, however, are guaranteed to the defendant upon which he can insist regardless of the state of the evidence, such as the right to a jury trial," and

5

that "the distinction between reversible and nonreversible error does not rest upon the distinction between error relating to constitutional rights as contrasted with other rights, but that the section applies to both." (*Ibid.*)

Regarding the category of errors that do not automatically establish a miscarriage of justice, we explained that our previous opinions had used various formulations to articulate the meaning of " 'miscarriage of justice.' " (*Watson*, *supra*, 46 Cal.2d at pp. 835–836.) Surveying these various formulations, we concluded that "the test *generally* applicable may be stated as follows:  That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836, italics added.)  In sum, while stating the prejudice standard that applies to errors subject to harmless error analysis, *Watson* recognized that not all errors are subject to the harmless error test it articulated and that some errors may automatically constitute miscarriages of justice "regardless of the state of the evidence." (*Id.* at p. 835.)

In *People v. Cahill* (1993) 5 Cal.4th 478, we reiterated *O'Bryan*'s construction of the miscarriage of justice standard:  "[A]lthough, as a general rule, the determination whether an error has resulted in a 'miscarriage of justice' within the meaning of the constitutional provision will depend upon an appellate court's evaluation of the effect of the error in light of the evidence at trial, in some contexts — for example, the erroneous denial of a defendant's right to jury trial — an error may result in a miscarriage of justice, and require reversal, regardless of the strength of the evidence properly received at trial." (*Id.* at p. 491.)  We made similar statements in *People v. Ernst* (1994) 8 Cal.4th 441, 448, and *People v. Breverman* (1998) 19 Cal.4th 142, 174.  (See maj. opn., *ante*, at pp. 25–26.)

In *People v. Collins* (2001) 26 Cal.4th 297, the trial court "found defendant guilty of three counts of forcible and five counts of nonforcible lewd or lascivious acts upon a child under the age of 14 years. [Citation.] The trial court found true the allegations that defendant committed three of the acts by force or fear and that two of the acts involved substantial sexual conduct [citations], and that defendant had served a prior prison term [citation]." (*Id.* at p. 303.) We held that the defendant's jury trial waiver was invalid because the trial court had obtained the waiver by assuring the defendant of an unspecified benefit. (*Id.* at p. 312.) The Attorney General argued that we should review the case for harmless error (*id.* at p. 311), but we unanimously rejected that argument. As the court explained, "a harmless error standard does not, and cannot, apply in the present case. Under the federal Constitution, the right to trial by jury is recognized as fundamental, and its denial is 'structural error,' compelling reversal of a judgment of conviction without the necessity of a determination of prejudice. [Citations.] Similarly, under the California Constitution, the right to jury trial is fundamental, and its denial is considered a 'structural defect in the proceedings,' resulting in a 'miscarriage of justice' within the meaning of California Constitution, article VI, section 13, and requiring that the judgment of conviction be set aside." (*Ibid.*; see *id.* at p. 314 (conc. opn. of Brown, J.).)

Finally, and most recently, our unanimous opinion in *People v. Lightsey* (2012) 54 Cal.4th 668 observed: "Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result. [Citations.] As we have explained, however, 'under the California constitutional harmless-error provision some errors . . . are not susceptible to the "ordinary" or "generally applicable" harmless-error analysis — i.e., the *Watson* "reasonably probable" standard — and may require reversal of the judgment notwithstanding

7

the strength of the evidence contained in the record in a particular case.' " (*Id.* at p. 699.)  In *Lightsey*, we held that the trial court violated Penal Code section 1368 by allowing the defendant to represent himself in a competency proceeding, and we went on to conclude that the error automatically constituted a miscarriage of justice.  (*Lightsey*, at p. 702.)

As this discussion makes clear, our statement in *Watson* of the harmless error standard routinely applied by California appellate courts does not articulate the full meaning of section 13, nor did it purport to do so.  As *Watson* itself and our cases before and after *Watson* have recognized, section 13 has always meant that certain errors automatically constitute miscarriages of justice and require reversal.  The reason was best stated in *O'Bryan*, which I quote again:  "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty.  It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (*O'Bryan*, *supra*, 165 Cal. at p. 65.)

Our Legislature has determined that before the state may confine a defendant involuntarily, it must give him or her an adequate measure of procedural justice.  "The right to trial by jury reflects . . . 'a profound judgment about the way in which law should be enforced and justice administered' " (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281), and that right must be observed "even though there had been the clearest proof" (*O'Bryan*, *supra*, 165 Cal. at p. 66) that the defendant requires continued treatment.  Today's holdings requiring reversal when a trial court errs in completely denying an MDO or NGI defendant the right to a jury trial

8

follow from the text, history, and purpose of section 13 as well as this court's consistent and longstanding interpretation of that provision.

**LIU, J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

# CONCURRING AND DISSENTING OPINION
## BY CANTIL-SAKAUYE, C. J.


I concur in the statutory interpretation in parts I through III of the majority opinion. But I respectfully dissent from the remainder of the opinion concerning the standard of harmless error review applicable to the state law errors that occurred in this case and the proper application of that standard. Unlike the federal Constitution, which contains no provision addressing the subject of harmless error in a judicial proceeding, the California Constitution contains an explicit provision directed to that subject, providing that "[n]o judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13 (hereafter article VI, section 13).) Notwithstanding this explicit state constitutional provision generally eschewing the application of an automatic or reversible per se harmless error standard to state law error, today's opinion, for the first time, holds that an automatic reversal rule should apply to the trial court's failure to advise a defendant in a mentally disordered offender (MDO) commitment extension proceeding of the statutory right to a jury trial and to obtain the defendant's personal waiver of a jury trial. It does so on the theory that such errors always constitute "a miscarriage of justice" because the errors assertedly totally denied defendant the right to a jury trial. (Maj. opn., *ante*, at pp. 24-27.)

Contrary to the claim of the majority, however, we have no occasion in this case to decide whether the total denial of the statutory right to a jury trial in an MDO proceeding automatically constitutes a "miscarriage of justice" within the meaning of article VI, section 13. Whether or not the total denial of the right to a jury trial in such a proceeding invariably constitutes a miscarriage of justice, describing the errors in this case as the total denial of a jury trial is inaccurate and gives a misleading impression regarding the nature and severity of the actual errors at issue here. This matter is a civil commitment proceeding, not a criminal prosecution, and this is not a case in which a defendant who expressed a wish to be tried by a jury was wrongfully denied that request and was required to face trial by the court. Nor is it a case in which an unrepresented defendant, unaware of the right to be tried by a jury, was left in the dark and subjected to a court trial while ignorant of his or her jury trial right. Instead, this is a case in which defendant was represented by counsel, who, undoubtedly with full knowledge of his client's right to be tried by a jury, intentionally requested that the matter be heard by the court rather than a jury. The defect here was not in wrongfully depriving defendant of the right to a jury trial in an MDO commitment extension proceeding, but rather the much less serious mistakes of failing to advise defendant *personally* of the statutory right to a jury trial and to obtain an on-the-record waiver of that right from defendant *personally* rather than from defendant's counsel.

I agree with the majority that the trial court erred in these respects. However, these failures are of an entirely different, and less serious, magnitude than a wholesale deprivation of the right to a jury trial in a criminal trial or in an MDO commitment extension proceeding; they are not properly viewed as inevitably giving rise to a "miscarriage of justice" (art. VI, § 13) that calls for automatic reversal of a judgment without regard to the actual effect of the error on the fairness of the proceeding or the outcome of the case. Contrary to the

2

majority's claim, these are not the types of errors whose prejudicial effect defies detection or measurement. Instead, when a defendant's counsel has concluded that it is in the defendant's interest to be tried by the court rather than a jury, it will often be possible to realistically assess whether it is reasonably probable that the defendant, if personally advised of the right to a jury trial in an MDO commitment extension proceeding and asked whether he or she waives that right, would have chosen to be tried by a jury rather than the court. In my view, to require automatic reversal of a judgment for *these* types of procedural errors, where it is highly unlikely that the defendant was unaware of the right to a jury trial or would have requested a jury trial over his or her counsel's contrary advice, fails to respect the history and purpose of California's distinct constitutional harmless error provision. Accordingly, I dissent from this aspect of the majority opinion. And, considering the case as a whole, I believe it is clear that it is not reasonably probable that the trial court errors affected the outcome of this proceeding. Accordingly, I would find the trial court errors harmless under the applicable harmless error standard and would affirm the judgment.

## I. BACKGROUND

Defendant Bruce Lee Blackburn was convicted of first degree burglary and forcible false imprisonment after entering the home of an 85-year-old woman and accosting her in bed while he was naked. He was eventually declared an MDO and committed to Atascadero State Hospital as a condition of parole. After two extensions of Blackburn's commitment, the Santa Clara County District Attorney filed a third petition for recommitment, which Blackburn elected to oppose and as to which he requested a trial. The trial court failed to advise Blackburn of his right to a jury trial and relied on his counsel's request to waive jury trial in favor of a court or bench trial.

3

At that bench trial, the prosecutor presented testimony of an expert who diagnosed Blackburn as having "schizoaffective disorder, bipolar type" that was not in remission despite his medication and that the condition was the same disorder involved in his prior violent crime. Blackburn experienced delusions, paranoia, and impulsivity that the expert believed would pose a danger to others. The expert further noted that Blackburn had failed to formulate a viable discharge plan. Blackburn did not contest the expert's testimony, and he neither testified nor offered any defense evidence. The trial court sustained the petition and extended Blackburn's commitment for one year pursuant to Penal Code section 2972, subdivision (e).[1]

For the first time on appeal, Blackburn complained that he was denied his statutory right to a jury trial because he was not personally advised of that right and did not personally waive that right. On appeal, Blackburn does not contend that his bench trial was conducted by a biased judge or point to anything that suggests that if advised of the right to a jury trial and asked if he wanted to invoke or waive that right, he would have chosen to be tried by a jury rather than by the court. Nonetheless, today's opinion concludes that the trial court's failure to personally advise Blackburn of his right to a jury trial and to obtain a personal waiver of that right from Blackburn is sufficient to require reversal of the judgment without application of the ordinary harmless error standard mandated by article VI, section 13. For the reasons discussed below, I dissent.

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

## II. Discussion

### A. The standard of review for error under state law applicable in this case

The rules governing the reversal of judgments based on state law error are well settled. We have previously stated:

"Our state Constitution provides that '[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) 'The effect of this provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal *depends on the circumstances in each case*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, italics added.)

As our past decisions have recognized, the governing harmless error provision was added to our state Constitution in 1911 in response to earlier California decisions that had applied a reversible per se rule to relatively minor procedural errors in criminal cases, overturning criminal convictions under circumstances even though it was clear, as a realistic matter, that the error had not affected the result in the case. (*People v. Cahill* (1993) 5 Cal.4th 478, 490-491 (*Cahill*), citing *People v. O'Bryan* (1913) 165 Cal. 55, 64.) In light of this explicit California constitutional provision, our decisions have long made it clear that, as a general matter, " 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim*

5

*v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at p. 800, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Today's opinion acknowledges this general rule, but it fails to apply it in this case.  Instead, the majority maintains that this case should be viewed as falling within an established, but limited, exception to the general rule, applicable to errors that are so fundamental that they *inevitably* amount to a "miscarriage of justice" within the meaning of article VI, section 13, regardless of how unlikely it may be that the errors actually affected the outcome.  (See, e.g., *Cahill*, *supra*, 5 Cal.4th at pp. 487-493; see also *id.* at pp. 501-502 [describing this category as involving "fundamental 'structural defects' in the judicial proceedings, analogous to those to which the United States Supreme Court referred in [*Arizona v. Fulminante* (1991) 499 U.S. 279]"].)  The majority reaches its conclusion by characterizing the errors in this case as the "denial of a jury trial" (maj. opn., *ante*, at pp. 24, 26) and by analogizing the errors to the denial of a felony defendant's right to a jury trial in a criminal proceeding.  (*Id.* at pp. 26-27.)

Additionally, Justice Liu's separate opinion to his majority opinion more broadly contends that the total denial of the right to a jury trial always constitutes a per se miscarriage of justice, apparently without regard to whether the proceedings are civil or criminal in nature or whether the particular right to jury trial is constitutionally-based or is purely statutory.  For this proposition, he explores the text of article VI, section 13 and its history and purpose.  Relying on case law involving felony criminal prosecutions, the separate concurring opinion concludes that the statutory errors at issue here denied Blackburn "an adequate measure of procedural justice" thereby depriving him of his right to a jury trial.  (Conc. opn. of Liu, J., *ante*, at p. 8.)

But we need not establish such a broad rule for all judicial proceedings held in this state.  In this civil matter, the advisement and waiver errors are simply

6

procedural errors of a statutory nature, and article VI, section 13 states that judgments cannot be set aside "for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (*Ibid*.) Both the majority opinion and Justice Liu's concurring opinion erroneously assume that the procedural errors in this matter had the automatic effect of denying Blackburn his statutory right to a jury trial without regard to examining the case-by-case circumstances of whether the statutory errors affected the decision to proceed with a bench trial.

As already noted, however, the errors in this case cannot accurately be described as the denial of a jury trial. This is not an instance in which an MDO defendant requested to be tried by a jury and the trial court denied the request and required the defendant's case to be decided by the court (either because the court was unaware of the statutory right to a jury trial or because the defendant's counsel objected to a jury trial and the court was of the view that counsel, rather than his or her client, controlled the decision regarding a jury trial). Nor is this a case in which an MDO defendant was not represented by counsel and failed to request a jury trial because he or she was unaware of the right to be tried by a jury and was not advised of that right. Instead, this is a case in which defendant was represented by counsel and defendant's counsel, presumably well aware of his client's right to a jury trial, explicitly requested that the case be heard by the court rather than by a jury. The errors here were simply the court's failure to advise defendant personally of the right to a jury trial and to elicit an explicit waiver of that right from defendant personally.

To be sure, an MDO defendant's statutory rights to be personally advised by the court of the right to jury trial and to be asked personally whether he or she wishes to waive that right are unquestionably meaningful and significant

7

safeguards. But the beneficial nature of these safeguards does not mean that a proceeding in which these safeguards have not been provided totally denies a defendant the right to a jury trial or deprives a defendant of a fair procedure.

The fact that a trial court in an MDO proceeding fails to advise the defendant personally of the statutory right to a jury trial and to elicit an express on-the-record waiver of that right from the defendant personally does not mean that the defendant is unaware of the availability of a jury trial or that he or she wishes to be tried by a jury rather than the court. The applicable statutory requirements that the court personally advise an MDO defendant of the right to jury trial and obtain an explicit personal waiver from the defendant do not distinguish between cases in which the defendant is represented by counsel or is unrepresented, but when, as here, a defendant is represented by counsel, the statutory requirements generally operate simply as backup or prophylactic safeguards. When a defendant is represented by counsel, it is generally reasonable to assume that counsel has previously discussed the option of a jury trial with the defendant. (See *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 272 ["in the absence of evidence to the contrary, the court must assume counsel is competent" and had discussed the decision to waive the statutory right to jury trial with his client].) And when counsel requests a court trial and the defendant does not object, it is also reasonable, as a practical matter, to infer that the defendant agrees with the request for a court, rather than a jury, trial. Moreover, even if defense counsel has not discussed the statutory jury trial right with his client and the client is otherwise unaware of that right, the fact that the case has been tried by the court rather than by a jury cannot be reasonably characterized as the result of *the trial court's denial* of the defendant's right to a jury trial. Instead, the court trial is the result of *defense counsel's determination that it is in the defendant's best interest to be tried by the court, rather than by a jury*, a determination that, in

8

the absence of very unusual circumstances, the defendant, if asked directly, is not likely to have rejected. Contrary to the majority's assertion (maj. opn., *ante*, at p. 26), an on-the-record waiver of a jury trial by the defendant personally is not the only way to tell, realistically as opposed to theoretically, whether a defendant who desired a jury trial was denied that opportunity. In short, the errors that occurred in this case are much different from, and cannot properly be equated with, a complete denial or deprivation of the right to a jury trial.

It is true, of course, that it is *possible* that, if personally advised by the trial court of the right to a jury trial and asked whether he or she waives that right, a defendant who is represented by counsel may insist upon being tried by a jury notwithstanding his counsel's contrary advice. But, under article VI, section 13, a court may not presume that these types of statutory errors are prejudicial. Instead, it must undertake a realistic examination of all the circumstances to determine whether it is reasonably probable that the errors affected the outcome of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 173 ["Article VI, section 13 eliminated the prior appellate presumption that any substantial trial error causes a miscarriage of justice."].)

In a variety of contexts, past California decisions have held that the absence of similar procedural safeguards ― that is, advice from the trial court regarding the existence of a fundamental right delivered in person to the defendant and an explicit personal waiver of that right by the defendant ― does not constitute the type of fundamental structural defect that demonstrates that the defendant has not been accorded a fair and just procedure and for that reason invariably constitutes a "miscarriage of justice" for purposes of article VI, section 13.

For example, as a matter of state and federal constitutional law, a criminal defendant has a fundamental right to be physically present during all parts of a trial in which the defendant faces felony criminal charges. (*Kentucky v. Stincer*

9

(1987) 482 U.S. 730, 745; *People v. Concepcion* (2008) 45 Cal.4th 77, 81.)

California, by statute, has long required a trial court to obtain a written waiver in open court from the defendant whenever the defendant is not present during felony trial proceedings. (§ 977, subd. (b)(2) [setting out the specific form that a personal waiver by a defendant must take].) Nonetheless, in cases in which the defendant is represented by counsel, California decisions have repeatedly and uniformly held that even if the defendant has not been personally advised by the court of his or her right to be present and even when the trial court has erred in failing to obtain the statutorily required personal waiver of that right from the defendant, the error is purely statutory and does not itself constitute a miscarriage of justice. Instead, the trial court error is subject to the ordinary harmless error standard mandated by the California Constitution. (*People v. Moon* (2005) 37 Cal.4th 20-21 [the lack of a written waiver is reviewed for error under *People v. Watson*, *supra*, 46 Cal.2d 818 (*Watson*); rejecting the argument that there was no showing that the defendant understood the nature of the right he was waiving]; *People v. Weaver* (2001) 26 Cal.4th 876, 968 [capital defendant's absence during the playing of a videotape to the jury was "merely statutory" error; reviewed under *Watson*]; (*People v. Jackson* (1996) 13 Cal.4th 1164, 1211 [error in capital defendant's one-day absence during the taking of testimony was "of a purely statutory dimension"; reviewed under *Watson*].)

Similarly, past California decisions have held that even though defense counsel ordinarily has control over what witnesses to present in a criminal proceeding, a defendant in a criminal proceeding has a fundamental constitutional right to testify on his or her own behalf, even when the defendant is represented by counsel and counsel does not want to call the defendant as a witness. (*People v. Lucas* (1995) 12 Cal.4th 415, 444; *People v. Lucky* (1988) 45 Cal.3d 259, 282; *People v. Robles* (1970) 2 Cal.3d 205, 214-215.) Nonetheless, the governing

10

decisions have not held that a defendant has been denied the right to testify in his or her own behalf simply because the trial court has not personally advised the defendant of that right and has not elicited a personal waiver of that right from the defendant. Instead, the decisions have found a violation of a defendant's right to testify over counsel's contrary advice only when the defendant's desire to testify has been brought to the trial court's attention and the court has denied the defendant the opportunity to testify. (See, e.g., *In re Horton* (1991) 54 Cal.3d 82, 95 ["courts may assume that counsel's waiver reflects the defendant's consent in the absence of an express conflict"; "there is no duty to admonish and secure an on the record waiver unless the conflict comes to the court's attention."].) In the absence of the defendant's invocation of the right to testify, we have rejected a defendant's claim, on appeal, that his conviction should be automatically reversed because the trial court did not advise him of his right to testify over his counsel's objection or obtain a waiver of that right. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1331-1333.)

The majority does not deny that it is applying an automatic or reversible per se rule to a trial court's failure to obtain an explicit, on-the-record personal waiver of a jury trial by defendant (maj. opn., *ante*, at p. 27), but maintains that it is not applying an automatic reversal rule when the trial court's error is solely in failing to advise a defendant of the right to a jury trial. (Maj. opn., *ante*, at p. 29.) In that circumstance, according to the majority, a trial court's acceptance of a defendant's personal waiver without an express advisement can be harmless "if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary." (*Ibid*.) The majority emphasizes that, under its rule, "the requirement of an *affirmative* showing means that no valid waiver may be presumed from a silent record." (*Ibid.*)

11

Even in the limited context to which the majority's harmless error rule applies, however, the novel and very restrictive harmless error rule it fashions bears no resemblance to the ordinary harmless error standard set forth in *Watson* and applied in prior cases. The majority's harmless error test does not focus on all of the relevant circumstances to determine whether or not it is reasonably probable that a trial court's failure to personally advise an MDO defendant of the right to jury trial actually affected the outcome of the case. For example, the majority test does not permit an appellate court to find that the advisement error did not affect the outcome and does not warrant reversal, either (1) because it is not reasonably probable that, if so advised, defendant would have requested a jury trial over counsel's advice, or (2) because, even if the record does not *affirmatively* show that defendant *explicitly* waived a jury, it is reasonable to infer that the defendant implicitly waived a jury trial when the defendant's past experience indicates he or she was aware of the right to a jury trial and defendant raised no objection when defense counsel requested a court trial. In short, even in this limited context, the majority pays no heed to the well-established California harmless error jurisprudence.

Consequently, in my view it is clear that the type of errors at issue here may not properly be treated as reversible per se, but rather are subject to the ordinary harmless error standard embodied in article VI, section 13.**2**

---

**2** Because the errors in this case were simply the trial court's failure (1) to personally advise an MDO defendant who was represented by counsel of the right to jury trial and (2) to obtain a personal waiver of that right, there is no need to decide what harmless error standard would apply if an MDO defendant who requested to be tried by a jury was denied that opportunity or if an MDO defendant who was not represented by counsel was not advised of the right to jury trial or asked whether he or she waived that right. There is no reason to prejudge those questions in this case.

**B. MDO proceedings are not governed by the right to a jury trial under the federal or state Constitution nor are they equivalent to criminal trials**

Today's opinion does not realistically come to grips with the difference between the limited errors that occurred in this case and a complete deprivation of the right to jury trial that would arise when a defendant who expresses a wish to be tried by a jury is denied that right. The majority, however, does cite one case — *People v. Ernst* (1994) 8 Cal.4th 441 (*Ernst*) — in which a criminal conviction was reversed because the trial court had not elicited an express waiver of the right to jury trial from the defendant personally, even though the defendant was represented by counsel and counsel had clearly stated that both he and the defendant agreed to waive a jury trial.

Unlike the present case, however, *Ernst* concerned the defendant's right to a jury trial in a *criminal* prosecution derived from the federal and state *Constitutions*, not a state statute. In concluding that reversal was required, the court in *Ernst* relied upon the very specific language of article I, section 16 of the California Constitution, which declares that " '[a] jury may be waived in a criminal cause by the consent of both parties *expressed in open court by the defendant and the defendant's counsel*.' " (*Ernst*, *supra*, 8 Cal.4th at p. 445.) The specific language of article I, section 16 that was crucial in *Ernst* — explicitly requiring a jury waiver to be expressed in open court by both the defendant's counsel and the defendant — does not apply outside the criminal context. In contrast to a criminal case, article I, section 16 provides that "[i]n a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." Here, although the governing statute contemplates waiver by the

13

defendant in an MDO proceeding, it does not state that the waiver must be expressed in open court by the defendant.**3**

Even in the criminal context, past decisions of this court have held that in circumstances in which a criminal defendant's right to a jury trial of an issue rests on a statutory rather than a constitutional basis, errors relating to the statutory jury trial right are not prejudicial per se but rather are subject to harmless error review. For example, in *People v. Marshall* (1996) 13 Cal.4th 799 (*Marshall*), the trial court failed to permit the jury to make a death-eligibility finding on a multiple-murder special-circumstance allegation as required by section 190.4, the

---

**3** The majority also cites *People v. Collins* (2001) 26 Cal.4th 297 (*Collins*) in support of its conclusion, but that case involved an instance in which the trial court improperly induced the defendant to waive a jury trial by offering the defendant a benefit if he agreed to be tried by the court rather than a jury. In *Collins*, this court held that the trial court's "error in improperly inducing a waiver of that right amounts to a 'structural defect in the proceedings' requiring that the judgment of conviction be set aside without the necessity of a determination of prejudice." (*Id.* at p. 312.) The facts of *Collins* are entirely distinguishable from the present case, where no inducement was given to encourage the waiver of a jury trial, and defense counsel knowingly and voluntarily requested a court trial and defendant raised no objection.

In addition, and quite significantly, as in *Ernst*, in *Collins* the requirement of a valid, express, in-court waiver of a jury trial by the defendant rested on the provisions of article I, section 16, a requirement that, as noted above, does not apply in a civil proceeding. In fact, the court's opinion in *Collins* specifically relied upon the federal and state constitutional basis of the criminal defendant's right to a jury in that case in distinguishing its holding from this court's then-recent decision in *People v. Epps* (2001) 25 Cal.4th 19 (*Epps*) — a case described and discussed below. The court in *Collins* explained in this regard that because the defendant's right to a jury trial in *Epps* was based on a state statute rather than the Constitution, the jury trial error in *Epps* was "purely one of state law [and thus] was subject to the state test of harmless error (*Watson*, *supra*, 46 Cal.2d at p. 836), requiring reversal only upon a finding of a reasonable probability of a result more favorable to the defendant in the absence of the error." (*Collins*, *supra*, 26 Cal.4th at p. 313, fn. 5.)

14

applicable California death penalty statute.**4** On appeal, this court rejected the argument that the trial court error in failing to submit that issue to the jury was a structural defect and reversible per se, and held instead that the failure to submit the special circumstance allegation to the jury was "susceptible to quantitative assessment because the record compels the conclusion the error had no effect on the outcome of the trial." (*Marshall*, *supra*, at pp. 851-852.) We explained that because the jury had properly convicted the defendant of three counts of murder, "there is no possibility this jury would have found defendant *not death-eligible* had the special circumstance allegation been submitted to it." (*Id*. at p. 852.) Accordingly, we affirmed the judgment of death.

Similarly, in *Epps*, *supra*, 25 Cal.4th 19, the trial court failed to permit a jury trial on several prior-conviction allegations that enhanced the defendant's sentence by five years and additional enhancements under the three strikes law. We adhered to article VI, section 13, and again rejected the argument that the error was a structural defect requiring automatic reversal "because the right to a jury trial of the prior conviction allegations in this case is purely a creature of state statutory law." (*Epps*, *supra*, at p. 29.) We concluded that the error was harmless considering that "the only factual question for the jury was whether the prior convictions occurred, and defendant did not question this fact at his prior convictions trial" and "the prior conviction records were official government documents clearly describing the alleged convictions." (*Id*. at pp. 29-30.)

---

**4** The opinion in *Marshall* explained that a jury trial on the special circumstance allegation was required by the applicable statute, not the Constitution. (*Marshall, supra*, 13 Cal.4th at p. 851, fn. 9.)

The majority seems to find significance in the fact that section 2972 affords defendants in MDO commitment proceedings protections "borrowed directly from the criminal context." (Maj. opn., *ante*, at p. 27.) The majority notes that in an MDO proceeding the statute requires a unanimous jury verdict and proof beyond a reasonable doubt. (§ 2972, subd. (a).)

But simply because MDO commitment proceedings share some protections afforded to defendants in criminal prosecutions does not justify departure from the generally applicable harmless error rule mandated by the California Constitution. The majority cites no case to justify this approach. If this were a valid reason to apply the majority's rule, an automatic reversal rule should have been applied to the denial of a jury trial concerning special circumstances in *Marshall* and concerning prior convictions in *Epps*. The proceedings in those cases afforded the criminal defendants *all* of the rights applicable in criminal proceedings, yet we did not apply a rule of automatic reversal where the defendant was erroneously not afforded a jury trial as required by the applicable statute. If we are to borrow protections provided in criminal proceedings for the present matter, then *Marshall* and *Epps* should supply the basis for how we evaluate any error concerning the right to a jury trial based only on statute. Moreover, the actual restrictions on life and liberty as to which a jury trial was not afforded in *Marshall* and *Epps* were far more serious than the one-year civil MDO commitment at issue in the present case. There is no reason to single out MDO proceedings for different treatment, as today's opinion does.

Simply put, unlike *Ernst*, the present case is not a criminal case. Section 2972 itself refers to an MDO commitment proceeding as a "civil hearing." (§ 2972, subd. (a); see *People v. Fernandez* (1999) 70 Cal.App.4th 117, 126, fn. 5; *People v. Robinson* (1998) 63 Cal.App.4th 348, 352; *People v. Superior Court* (*Myers*) (1996) 50 Cal.App.4th 826, 832.) As one court has noted, "the MDO

16

provisions are neither punitive in purpose nor effect and their procedural safeguards do not require us to transform the hearing into a criminal trial." (*Myers*, *supra*, at pp. 834.) Although some procedural safeguards that are applicable in criminal proceedings have been extended by statute to MDO proceedings, MDO proceedings do not have many of the protections afforded to criminal defendants. (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1404 ["a defendant in an MDO proceeding, despite the statutorily required proof beyond a reasonable doubt standard, does not have a constitutional right to the additional procedural safeguards generally reserved for criminal defendants, including a presumption-of-innocence instruction"]; see *People v. Williams* (2003) 110 Cal.App.4th 1577, 1592 [refusing to allow an absolute right of self-representation]; *People v. Clark* (2000) 82 Cal.App.4th 1072, 1081 [refusing to recognize a right against compulsory self-incrimination]; *People v. Robinson*, *supra*, at p. 349 [refusing to apply a prohibition against ex post facto laws].)

The high court has also rejected the argument that the provision of some criminal procedural safeguards found in criminal trials means that other protections provided to criminal defendants should also apply to civil commitment proceedings. In *Allen v. Illinois* (1986) 478 U.S. 364, the United States Supreme Court rejected the notion that the Fifth Amendment right against compulsory self-incrimination in criminal proceedings should also apply to a civil commitment proceeding under the Illinois Sexually Dangerous Persons Act. The court reasoned: "[T]he State has indicated quite clearly its intent that these commitment proceedings be civil in nature; its decision nevertheless to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions requiring the full panoply of rights applicable there." (*Allen*, *supra*, at p. 372.)

17

The fact that our courts have refused to provide other protections afforded in the criminal context to MDO commitment proceedings only accentuates why it is illogical to assume that civil MDO proceedings should be treated the same as criminal prosecutions. Criminal trials and civil MDO proceedings serve very different goals and purposes, yet today's opinion completely fails to address those differences and, instead, imposes a reversal rule derived from the constitutionally protected right to jury trial in criminal prosecutions.

Significantly, the majority does not hold that an MDO defendant's right to a jury trial rests on federal or state constitutional grounds; rather the majority proceeds on the assumption that the jury trial right in an MDO proceeding is based solely on the applicable statute.[5] Accordingly, because a defendant's procedural rights in an MDO proceeding to be personally advised by the court of a right to a jury trial and to be asked whether he or she waives that right derive from a state statute, the decision in *Ernst* and the other criminal cases relied upon by the

[5] No case has held that the federal or California constitution guarantees an individual a right to a jury trial in an MDO proceeding, and it would be difficult to reach such a conclusion. In general, the jury trial provisions of the United States and California Constitutions preserve "the right to trial by jury as it existed at common law . . . and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution." (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 287 [interpreting Cal. Const., art. I, former § 7, see now art I, § 16]; see *Duncan v. Louisiana* (1968) 391 U.S. 145, 160-161 [interpreting due process clause of the 14th Amend. of the U.S. Const.].) Commitment proceedings for MDO's, as defined by section 2970, were apparently unknown at common law, and the parties have not directed us to any authority suggesting otherwise. (See *Matter of Application of O'Connor* (1915) 29 Cal.App. 225, 235-236 ["where the state constitution guarantees the common-law right of trial by jury, only those cases in which that right was habitually exercised according to the course of the common law come within the terms of the guaranty, and . . . an inquisition of insanity is not one of those cases"].)

majority to support a reversible per se rule are clearly distinguishable from the present case, and there is no persuasive reason why they should be extended to civil MDO commitment extension proceedings.[6]

**C. The circumstances of the error in this matter do not defy harmless error review**

Quoting the high court's decision in *Sullivan v. Louisiana* (1993) 508 U.S. 275 (*Sullivan*), today's opinion additionally suggests that a reversible per se rule is justified because the error in question " 'def[ies] analysis by "harmless-error" standards' " on the theory that the effects of the error are " 'unmeasurable.' " (Maj. opn., *ante*, at p. 27, quoting *Sullivan*, *supra*, 508 U.S. at p. 281.)  But this reference to *Sullivan* is inapt.

---

[6]    I note that in *People v. Barrett* (2012) 54 Cal.4th 1081, the majority concluded that a person facing a civil commitment as a dangerous developmentally disabled person under Welfare and Institutions Code, section 6500, has no due process or equal protection right to be advised of the right to jury trial or to personally waive such a right.  Justice Liu's concurring and dissenting opinion in that case would have found that Barrett had a state statutory right to be advised of her jury trial right, but further concluded that the error was harmless under the state law harmless error test of *Watson*, stating "I would conclude on the basis of the evidence that there was no reasonable probability Barrett would have achieved a more favorable outcome had she been tried by a jury." (*People v. Barrett*, *supra*, at p. 1151 (conc. & dis. opn. of Liu, J.); see also *id.* at p. 1114 (conc. & dis. opn. of Werdegar, J. [finding trial court erred in failing to advise defendant of her jury trial right, but concluding that the error was nonprejudicial under art. VI, § 13 "because it was not reasonably probable she would have achieved a more favorable result had the trial court informed her of her jury trial right"].)  Contrary to the implication of the majority (maj. opn., *ante*, at pp. 29-30), absolutely nothing in the concurring and dissenting opinions in *Barrett* suggests that the defendant had knowingly and voluntarily waived that right or that resolution of the harmless error question turned on an affirmative showing of that fact.

19

In *Sullivan*, the high court recognized the "right to trial by jury in *serious criminal* cases to be 'fundamental to the American scheme of justice.' " (*Sullivan, supra*, 508 U.S. at p. 277, quoting *Duncan v. Louisiana* (1968) 391 U.S. 145, 149, italics added.) The quote from *Sullivan* cited by today's majority addressed a faulty instruction concerning the definition of reasonable doubt and how that erroneous instruction had the *effect* of denying the defendant his right to a jury trial for first degree murder in a manner that defied review. (*Sullivan,* at p. 281.) But in subsequent cases, the high court has distanced itself from some of the very broad language and reasoning in *Sullivan* (see, e.g., *Neder v. United States* (1999) 527 U.S. 1, 10-15), and has declined to apply an automatic reversal rule in somewhat analogous situations, including a trial court's failure to instruct the jury on an element of a charged offense (*ibid.*) and a trial court's failure to submit a sentencing factor for determination by a jury (*Washington v. Recuenco* (2006) 548 U.S. 212, 218-222).

Significantly, the majority does not address the potential difference between the errors that occurred in this case and the complete deprivation of the right to jury trial that would be presented, for example, when a defendant who expresses a wish to be tried by a jury is denied that right. The majority cites no case in which the United States Supreme Court (or, indeed, *any* court) has applied an automatic reversal rule in a case like this one — a civil commitment proceeding in which a party's right to a jury trial derives solely from statute, and the trial court's errors are simply failing to personally advise a defendant who is represented by counsel of the right to a jury trial and to obtain a personal waiver of that right from the defendant.

In my view, the prejudicial effect of the limited errors at issue here — namely, the trial court's failure to personally advise a defendant in an MDO proceeding of the right to jury trial and to obtain an on-the-record personal waiver

20

of that right — are fully amenable to review under the traditional state harmless error standard mandated by article VI, section 13.

The amenability of these types of statutory errors to harmless error review is clearly demonstrated by this court's past decisions.

In *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183 (*Zamudio*), for example, we analyzed the effect of a trial court error under a statute, section 1016.5, that requires a trial court to advise a defendant who is pleading guilty or no contest of all the possible immigration consequences of such a plea. In *Zamudio*, the defendant agreed to waive his jury trial and pled "no contest to the felony of unlawful driving or taking of a vehicle without the owner's consent." (*Id*. at p. 188.) Before taking the plea, the trial court properly advised the defendant of some of the immigration consequences of such a plea, but the court failed to advise him that his conviction might result in his being precluded from any future admission to this country. We agreed with the defendant's contention that the trial court had erred under the statute in failing to so advise him. (*Ibid*.)

Nonetheless, notwithstanding the fact that section 1016.5, subdivision (b), contained a provision specifically stating that, in the event of any advisement error under the statute, the court "shall vacate the judgment" and allow the defendant to withdraw the plea, in *Zamudio* this court concluded that the trial court's error could not properly be considered prejudicial per se and automatically require setting aside the defendant's plea. Instead, we held that the prejudicial effect of the error had to be determined under the standard established by article VI, section 13, and we concluded that under that constitutional provision the defendant was required to show prejudice from the absence of such advice, namely "that, properly advised, he would not have pleaded no contest in the first place." (*Zamudio*, *supra*, 23 Cal.4th at p. 192.)

21

Similarly, past decisions of this court that have addressed a trial court's failure to comply with the statutory safeguards regarding a criminal defendant's waiver of the right to be personally present at trial proceedings have also concluded that such errors are fully amenable to, and are properly evaluated under, the ordinary harmless error test established by article VI, section 13. (See, e.g., *People v. Riel* (2000) 22 Cal.4th 1153, 1195-1196; *People v. Mayfield* (1997) 14 Cal.4th 668, 738-739; *People v. Jackson, supra*, 13 Cal.4th at pp. 1209-1212.) In *People v. Jackson,* for example, after concluding that the trial court had violated the applicable provisions of section 977 in permitting the capital defendant in that case to be absent from a portion of the trial in which evidence was taken, this court declared that because "the error in this case is of a purely statutory dimension[,] [w]e will reverse the judgment only if we can conclude 'that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (13 Cal.4th at p. 1211 [quoting *Watson*].) The court in *Jackson* went on to find that '[n]o such reasonable probability appears in the present case," reasoning that because the defendant was aware of his right to be present at the trial proceedings in question and had agreed with his counsel's judgment that there was no need for his presence at such proceedings, "defendant's absence during that testimony was not likely to affect the outcome of the trial." (*Ibid.*)

As in *Zamudio* and the cases involving a waiver of personal presence, the relevant inquiry here is whether, if the trial court had properly advised Blackburn of his statutory right to a jury trial and sought a personal waiver, it is reasonably probable that the outcome of the proceeding would have been different. As the cited cases make clear, such an inquiry does not defy analysis under the ordinary harmless error standard.

Applying the traditional *Watson* harmless error standard to the circumstances of this case, I believe it is clear that it is not reasonably probable that the trial court errors affected the outcome of this matter. Here, nothing indicates that had Blackburn been advised of his statutory right to a jury trial and had he been asked whether he waived that right, he would have declined to waive that right. This matter was Blackburn's third MDO extension proceeding. Blackburn was represented by experienced counsel, who was fully aware that his client had the right to a jury trial and who, with that knowledge, determined that it was in his client's best interest to be tried by the court rather than by a jury. Presumably, counsel concluded that Blackburn would benefit from having this MDO matter decided by a trial judge who was experienced in handling such proceedings and might be less likely to be influenced by possible stigma concerning mental health issues than the average lay juror who has no experience with such matters. Furthermore, because the defense presented no evidence whatsoever, this is not a case in which there is evidence that, from defendant's perspective, would potentially be more persuasive to a jury than to a court. Under these circumstances, it is counterintuitive to conclude that Blackburn would have rejected his counsel's choice and insisted on a trial by jury after being advised of that right.

The case of *People v. Lightsey* (2012) 54 Cal.4th 668, relied on by the majority, is quite distinguishable. In that matter, the defendant was erroneously denied counsel during competency proceedings, and, instead, represented himself, presenting an expert who testified that the defendant was competent to stand trial. In *Lightsey*, we explained that such an error defied review because, if counsel had been appointed, there were "myriad possible strategic choices counsel might have made that could have affected the outcome, for example, by choosing a defense expert different from the expert defendant chose, [or] asking for a third expert to

23

break the tie between the two experts already consulted." (*Id.* at p. 701.) Moreover, "the evidence presented regarding defendant's competence was conflicting." (*Ibid.*) Consequently, we concluded that "allowing defendant to represent himself in the competency proceedings was akin to structural error, rendering the result of the proceedings — the finding that defendant was mentally competent to stand trial — unreliable." (*Ibid.*)

In stark contrast to the facts in *Lightsey*, Blackburn was represented by experienced counsel. There is no indication or evidence that Blackburn would have disagreed with his counsel's choice to have a bench trial. Because, we know what evidence the state presented and that the defense did not present any conflicting evidence at all, there was no evidence that might plausibly be considered more persuasive in defendant's favor if tried before a jury. The trial court errors here were amenable to harmless error review and were not prejudicial under the *Watson* standard.

### III. CONCLUSION

Past cases have explained that an overly broad rule of reversible error that automatically compels the reversal of a judgment on the basis of an error that did not affect the outcome "will result either in a superfluous retrial in which the outcome is a foregone conclusion or, even more unfortunately, in a new trial whose result is altered by the loss of essential witnesses or testimony through the passage of time." (*Cahill, supra*, 5 Cal.4th at p. 509.)

Today's majority commits just such a mistake by failing to follow the mandate of article VI, section 13, and holding that the statutory advisement and personal waiver errors at issue here should generally be considered prejudicial per se. Because the errors here do not in themselves constitute a "miscarriage of justice" (*ibid.*) and are amenable to constitutionally mandated harmless error review under article VI, section 13, I dissent from the majority's adoption of an

24

automatic reversal rule. And because I believe it is clear that the trial court errors were not prejudicial in this case, I would affirm the judgment.

**CANTIL-SAKAUYE, C. J.**

**I CONCUR:**

**CHIN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Blackburn

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 215 Cal.App.4th 809
**Rehearing Granted**

_____

**Opinion No.** S211078
**Date Filed:** August 17, 2015

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Gilbert T. Brown

_____

**Counsel:**

Rudy Kraft, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit, John H. Deist, Laurence K. Sullivan, Catherine A. Rivlin and Karen Z. Bovarnick, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Rudy Kraft
P.O. Box 1677
San Luis Obispo, CA  93406
(805) 546-9239

Karen Z. Bovarnick
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5550